IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:20-CV-103 (WOB-CJS)

TRESHAWN CODY, through his next
friends, Randy and Sharon Szabo, ET AL.,                     PLAINTIFFS,

VS.                    <u>MEMORANDUM OPINION AND ORDER</u>

KENTON COUNTY PUBLIC SCHOOLS, ET AL.,                     DEFENDANTS.

This is a lawsuit brought by Treshawn Cody and Tyler Szabo through Next Friends, Randy and Sharon Szabo, against several defendants associated with the Kenton County Public School District for alleged racial and disability discrimination. Currently before the Court is Defendants' Motion for Summary Judgment. (Doc. 48).

The Court has carefully reviewed this matter and, being advised, now issues the following Memorandum Opinion and Order.

### Factual and Procedural Background

#### A. The Plaintiffs

Plaintiffs Treshawn Cody ("Treshawn") and Tyler Szabo ("Tyler") were students at Dixie Heights High School in the Kenton County School District ("the District"). (Doc. 20 ¶¶ 1-2, 21). Treshawn lived with Randy and Sharon Szabo ("the Szabos"), from 2016 until he turned eighteen. (*Id.* ¶ 1). The Szabos did not adopt Treshawn, but were his legal guardians based on an agreement with

1

Treshawn's aunt. (Doc. 48 at 3, 5-6; Doc. 56-1, S. Szabo Aff. ¶ 3). Tyler is the Szabos' son. (Doc. 48 at 3; Doc. 56-1, S. Szabo Aff. ¶ 1).

Treshawn is African American. (Doc. 20 at ¶ 1). He also has disabilities including a cognitive deficit, which results in deficits in executive functioning, and Attention Deficit Hyperactivity Disorder (ADHD). (*Id.*).

During the 2017-2018 school year, Treshawn and Tyler were in the tenth grade and on the Dixie Heights basketball team. (*Id.* ¶ 21; Doc. 48 at 5). Defendants Roger Stainforth ("Coach Stainforth") and Thaddeus Highbaugh ("Coach Highbaugh") were their basketball coaches. (Doc. 20 ¶ 21; Doc. 48 at 5). Plaintiffs allege that they suffered discrimination based on Treshawn's race and disability on several occasions between December 2017 and May 2018 in connection with their membership on the basketball team. (Doc. 20 ¶ 23; Doc. 48 at 6).

## B. Incidents of Alleged Discrimination

On December 1, 2017, Sharon Szabo responded to a scheduling email sent by Coach Stainforth to indicate her preference that Treshawn and Tyler play on the junior varsity basketball team instead of the varsity team. (Doc. 48 at 6). She reported that two other students on the varsity team told Treshawn to "go sit with his white friends." (*Id.;* Doc. 20 ¶ 28). However, she did not make

a request that the incident be investigated or lodge any formal complaints. (Doc. 48 at 6).

On December 14, 2017, Treshawn told Coach Stainforth that he would be skipping practice because he needed a "mental break." (*Id.* at 7; Doc. 20 ¶ 31). Coach Stainforth perceived Treshawn's actions as "aggressive" and his attitude as "disrespectful." (Doc. 48 at 7; Doc. 50-3 at 1). Coach Stainforth then met with the Szabos and the parties agreed that an appropriate consequence for skipping practice would be that Treshawn would not be able to play in the next game. (Doc. 48 at 7; Doc. 50-3 at 1-2; Doc. 56-1, S. Szabo Aff. ¶ 6).

The following day, Treshawn came into Coach Stainforth's classroom to ask if he could play on the junior varsity team in a manner that Coach Stainforth perceived as "agitated and aggressive." (Doc. 20 at ¶ 33; Doc. 48 at 7; Doc. 50-3 at 2). Coach Stainforth then spoke with Matt Wilhoite ("Athletic Director Wilhoite"), the school's Athletic Director, and the two agreed that Treshawn should be removed from the basketball team due to his disrespectful behavior. (Doc. 48 at 7-8; Doc. 50-3 at 2). Coach Stainforth and Athletic Director Wilhoite then called Sharon Szabo to inform her of their decision. (Doc. 48 at 8; Doc. 50-3 at 2).

On December 18, 2017, the Szabos again met with Coach Stainforth to discuss their concerns about Coach Stainforth's treatment of Treshawn and his removal from the team. (Doc. 20 ¶

3

35; Doc. 48 at 8; Doc. 50-3 at 2). Coach Stainforth ultimately decided to allow Treshawn to return to the basketball team after a two-week suspension for his "disrespectful" behavior. (Doc. 20 ¶ 26; Doc. 48 at 8; Doc. 50-3 at 2).

Thereafter, Treshawn began attending practice again, starting with the first practice after the winter break on January 8, 2018. (Doc. 20 ¶ 37; Doc. 48 at 8).

Plaintiffs allege that, on February 12, 2018, Coach Highbaugh told four other players not to "hang out with Tyler" because doing so would "affect [their] playing time." (Doc. 20 ¶ 44).

On February 16, 2018, Coach Highbaugh sent Tyler back to the locker room during a game for not responding when he asked, "Who's ready to go back in?" (*Id.* ¶ 45; Doc. 48 at 17).

On February 19, 2018, Plaintiffs allege that Coach Highbaugh threw a basketball forcefully against the wall towards Tyler, causing the ball to nearly hit him in the head. (Doc. 20 ¶ 42). However, Tyler testified that Coach Highbaugh was merely demonstrating the problem with his pass and denied that Coach Highbaugh intentionally threw the ball at him. (Doc. 48 at 17; Doc. 58, T. Szabo Dep. at 44:24-45:2, 45:16-19).

On February 26, 2018, Treshawn was suspended from school for one day because he told a cafeteria employee that she made him "horny." (Doc. 20 ¶ 49; Doc. 48 at 8). Coach Stainforth and Athletic Director Wilhoite agreed that Treshawn should be

4

dismissed from the basketball team for the remainder of the season because of the incident and called Randy Szabo to inform him of their decision. (Doc. 48 at 9; Doc. 50-3 at 3). The school's Parent Contact Log reflects that Mr. Szabo agreed that Treshawn's behavior was "not defendable" and that he had "no argument" with the decision. (Doc. 50-5 at 1).

On February 28, 2018, Sharon Szabo emailed Defendant Karen Hendrix ("Principal Hendrix"), the school principal, to request that Tyler be moved out of Coach Highbaugh's class. (Doc. 20 ¶ 52; Doc. 48 at 9; Doc. 50-6 at 1). On March 4, 2018, Principal Hendrix left a responsive voicemail with the Szabos and changed Tyler's class as requested. (Doc. 48 at 9; Doc. 50-6 at 1).

On April 24, 2018, the Szabos met with Athletic Director Wilhoite and Defendant Tom Spritzky ("Assistant Principal Spritzky"), one of the school's assistant principals, to discuss their concerns regarding the treatment of Treshawn and Tyler. (Doc. 20 ¶ 53; Doc. 48 at 9). Assistant Principal Spritzky then sent an email to Principal Hendrix informing her that the school would need to investigate the bullying allegations made by the Szabos and that, in order to do so properly, they would need a statement specifically identifying the alleged incidents of bullying. (Doc. 48 at 9-10; Doc. 50-7 at 1). Assistant Principal Spritzky requested such a statement from Randy Szabo on April 30, 2018. (Doc. 48 at 10; Doc. 50-8 at 1).

5

On May 2, 2018, the Szabos met with Defendant Martha Setters ("Director Setters"), Executive Director for Assessment, and Defendant Tom Arnzen ("Director Arnzen"), Director of Pupil Personnel, for three hours to discuss their allegations. (Doc. 20 ¶ 54; Doc. 48 at 10). On May 17, 2018, Director Setters sent a letter to the Szabos stating that their concerns had been "thoroughly investigated" and that no allegations of bullying or violations of KHSAA guidelines had been substantiated. (Doc. 20 ¶ 55; Doc. 48 at 10).

On May 23, 2018, Sharon Szabo sent an email to Defendant Henry Webb ("Superintendent Webb"), the District's superintendent, challenging the findings of the investigation. (Doc. 20 ¶ 56; Doc. 48 at 10). Superintendent Webb responded with a request that Mrs. Szabo send him specific concerns in writing and any additional documentation she had. (Doc. 20 ¶ 56; Doc. 48 at 10).

At some point in May 2018, the Szabos withdrew Treshawn and Tyler from the District. (Doc. 20 ¶ 58; Doc. 48 at 11).

On June 8, 2018, Sharon Szabo responded to Superintendent Webb, informing him of a recent incident at a basketball scrimmage during which a Dixie Heights basketball player allegedly called a player from another school a "fucking nigger." (Doc. 20 ¶ 57; Doc. 48 at 10). She further alleged that the same player told the coaches, "This play fucking sucks" at practice, but that he was allowed to remain on the team, which indicated "favoritism, racism,

and bullying." (Doc. 20 ¶ 57; Doc. 48 at 10). An associate principal investigated the allegations. (Doc. 48 at 11; Doc. 50-9).

## C. Due Process Action

On November 27, 2018, Treshawn and the Szabos filed a request for a due process hearing with the Kentucky Department of Education regarding Treshawn's education rights. (Doc. 20 ¶ 59; Doc. 50-1 at 7-9). The request alleged that the District implemented Individual Education Plans (IEPs) that did not address Treshawn's disabilities and associated behaviors, that he failed to make adequate progress on any of his IEPs, that the IEPs lacked the appropriate amount of special education services, and that the IEPs were not consistently implemented. (Doc. 50-1 at 7).

The request also discussed the fact that Treshawn had been kicked off the basketball team and alleged that team staff and coaches "failed to allow him accommodations called for in his IEP" and "talked disparagingly about Treshawn among other staff who were not a part of Treshawn's educational team and discouraged other students from associating with Treshawn." (*Id.* at 8). The request pointed out that "Treshawn's guardians reported these issues and sought assistance through the district's chain of command to no avail." (*Id.*).

On April 1, 2019, the Szabos entered into a "Settlement Agreement and Release of Claims" ("Settlement Agreement") with Kenton County Schools, Superintendent Webb, and the Kenton County Board of Education on behalf of Treshawn. (Doc. 50-2). The Settlement Agreement released Kenton County Schools, its Board of Education members, and its employees from

> any theory of recovery or complaint that was asserted or which could have been asserted relating to the development, implementation, or propriety of educational plans, behavior plans, educational placement, stay-put, child-find; evaluation; or denial of FAPE under the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act, or Chapter 707 of the Kentucky Administrative Regulations; which were alleged or could have been alleged in [the Due Process Action].

(*Id.* at 2-3).

### D. This Lawsuit

Treshawn turned eighteen on July 26, 2019, and Tyler turned eighteen on November 18, 2019. (*See* Doc. 64 at 4). On October 28, 2019, Treshawn executed a Durable Power of Attorney granting the Szabos the authority to "institute, supervise, [and] prosecute . . . any and all legal, equitable, judicial, or administrative hearings, actions, suits, or proceedings involving [him] in any way." (Doc. 56-8 at 39, 57). On January 2, 2020, Tyler executed a Durable Power of Attorney granting the Szabos identical authority. (*Id.* at 10, 28).

On July 21, 2020, the Szabos filed this action as Next Friends on behalf of Treshawn and Tyler. (Doc. 1). Thereafter, Defendants filed a Motion to Dismiss. (Doc. 13). In response, Plaintiffs filed an amended complaint, alleging claims for: (1) deprivation of property and equal protection without due process in violation of the Fourteenth Amendment under 42 U.S.C. § 1983; (2) disability discrimination under 29 U.S.C. § 794, 42 U.S.C. § 12132, and K.R.S. Chapter 344; (3) racial discrimination under 42 U.S.C. § 2000d; and (4) bullying and harassment under K.R.S. §§ 158.148 and 158.156 against fifteen defendants associated with the District.[1] (Doc. 20). Plaintiffs also brought a fifth claim for retaliation under 34 C.F.R. § 100.7 against Coaches Stainforth and Highbaugh. (*Id.*). This Court then denied Defendants' Motion to Dismiss as moot, (Doc. 21), and Defendants filed an Answer to the Amended Complaint, (Doc. 24).

---

[1] The Defendants are: (1) Kenton County Public Schools; (2) Superintendent Webb, in his individual and official capacities; (3) Principal Hendrix, in her individual and official capacities; (4) Coach Stainforth, in his individual and official capacities; (5) Assistant Principal Spritzky, in his individual and official capacities; (6) Athletic Director Wilhoite, in his individual and official capacities; (7) Director Arnzen, in his individual and official capacities; (8) Director Setters, in her individual and official capacities; (9) Coach Highbaugh, in his individual and official capacities; (10) the Kenton County Board of Education; (11) Carl Wicklund, in his official capacity as a Kenton County School Board Member; (12) Karen Collins, in her official capacity as a Kenton County School Board Member; (13) Carla Egan, in her official capacity as a Kenton County School Board Member; (14) Jessica Jehn, in her official capacity as a Kenton County School Board Member; and (15) Shannon Herold, in her official capacity as a Kenton County School Board Member.

*Analysis*

Under federal law, summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). "In determining whether there exists a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party." *See Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 992 (6th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is inappropriate if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Id*. However, "[t]he non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); Fed. R. Civ. P. 56(e)(2)).

## A. Article III Standing

"Because standing doctrine comes from Article III's case-or-controversy requirement, it is jurisdictional and must be addressed as a threshold matter." *Kanuszewski v. Mich. Dep't of*

*Health & Hum. Servs.*, 927 F.3d 396, 405 (6th Cir. 2019) (citing *Nikolao v. Lyon*, 875 F.3d 310, 315 (6th Cir. 2017)). Standing must be determined as of the time the complaint is filed. *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004) (citing *Cleveland Branch, NAACP v. City of Parma*, 263 F.3d 513, 524 (6th Cir. 2001)). A plaintiff has standing if: (1) they have suffered an injury-in-fact that was (2) caused by the defendant's conduct and (3) the court can likely redress the injury by deciding in the plaintiff's favor. *Kanuszewski*, 927 F.3d at 405 (citing *Nikolao*, 875 F.3d at 315–316).

### *i. Next Friends*

Although there is no dispute that Treshawn and Tyler would have Article III standing to bring the instant claims, (Doc. 64 at 2), Defendants argue that this case must be dismissed for lack of jurisdiction because the Szabos lack standing to assert Treshawn and Tyler's claims as their Next Friends. (Doc. 48 at 12–14). Federal Rule of Civil Procedure 17(c)(2) provides that "[a] minor or an incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem."

Whether a purported "next friend" has capacity to sue on behalf of another is determined, under Federal Rule of Civil Procedure 17(b), by the law of the state where the court is located. *See Brimhall v. Simmons*, 338 F.2d 702, 706 (6th Cir. 1964)

(finding that the capacity of a plaintiff guardian to maintain an action was controlled by the law of the state in which the district court sat). Further, whether an individual may sue on their own behalf is determined by the law of the individual's domicile. Fed. R. Civ. P. 17(b)(1); *see also Thomas v. Humfield*, 916 F.2d 1032, 1035 (5th Cir. 1990) (finding that the law of an individual's domicile determines their competence to sue on their own behalf for purposes of Rule 17(c)). Thus, Kentucky law applies to determine the capacity of all parties in this case.

Here, it is undisputed that Treshawn and Tyler were both eighteen years old on July 21, 2020, when the initial complaint in this action was filed. (Doc. 56 at 1; Doc. 64 at 4). As such, despite Plaintiffs' arguments that they were "youthful" and were still in high school at the time this litigation began, (Doc. 56 at 5), neither were minors for the purposes of Federal Rule of Civil Procedure 17(c)(2).

Although Plaintiffs note that Treshawn has a disability, that is not enough to render him "incompetent." Under Kentucky Rule of Civil Procedure 17.03, a person is not found to be incompetent or of "unsound mind" for the purposes of appointing a guardian or allowing a next friend to bring an action unless they have been so adjudicated. *See Goff v. Walker ex rel. Field*, 809 S.W.2d 698, 699 (Ky. 1991) (finding that letters from two physicians fell "far short" of legal adjudication of incompetency and did not entitle

12

a party to an appointed guardian ad litem even where it was obvious that he was incompetent to aid in his defense); *Straney v. Straney*, 481 S.W.2d 292, 293–94 (Ky. 1972) (holding that a person was not of "unsound mind" for the purposes of appointing a guardian ad litem unless they had been so adjudicated).

Here, it is undisputed that neither Treshawn nor Tyler have ever been adjudicated to be incompetent or of "unsound mind." The fact that a psychoeducational analysis conducted for the purpose of "planning appropriate educational programming" in connection with an IEP concluded that Treshawn had low cognitive functioning, very low educational skills, and moderately low adaptive skills, (Doc. 56-2 at 1, 6), does not mean that there has been a legal adjudication that Treshawn is incompetent to bring a lawsuit on his own behalf, much like the letters from physicians in *Goff* were insufficient for that purpose. The fact that Treshawn has been diagnosed with ADHD, (Doc. 56-2 at 8), is similarly insufficient to find him incompetent. *See Mickelson v. Mickelson*, No. 5:16-CV-267-KKC, 2016 WL 3951085, at *1 (E.D. Ky. July 20, 2016) (holding that a finding of disability under the Americans with Disabilities Act was not equivalent to finding an individual incompetent).

Accordingly, because neither Treshawn nor Tyler were minors or incompetent persons at the time this action was filed, the Court

finds that Randy and Sharon Szabo cannot assert their claims as Next Friends.[2]

### ii.  Powers of Attorney

However, this determination does not end the analysis. Plaintiffs argue that, even if the Szabos cannot assert Treshawn and Tyler's claims as their Next Friends, they still have standing to bring this action as agents pursuant to the powers of attorney that both Treshawn and Tyler executed after turning eighteen. (Doc. 65 at 2). Accordingly, Plaintiffs have requested to amend their Complaint to identify the Szabos as "agents" of Treshawn and Tyler rather than their Next Friends. (*Id.*; Doc. 65-1).

While the parties have not cited any binding case law on this point,[3] the Court finds that this is an issue of the Szabos' capacity to bring this lawsuit on behalf of Treshawn and Tyler rather than their standing. "[S]tanding acts as an element of the constitutional requirement that there be a 'case or controversy,'" but capacity is "a party's personal right to litigate in a federal court." 6A Charles Alan Wright et al., *Federal Practice and*

---

[2] In Plaintiffs' Supplemental Response, they concede that, "perhaps," they erred in identifying the Szabos as Next Friends. (Doc. 65 at 1).

[3] The only case cited by Plaintiffs, *United States v. Salti*, 579 F.3d 656 (6th Cir. 2009), is distinguishable. In that case, the Sixth Circuit reversed dismissal of a wife's claims under a criminal forfeiture statute insofar as she was acting on her husband's behalf pursuant to a power of attorney. *Id.* at 661, 668. However, the *Salti* Court also found that, unlike in this case, the wife had her own interest in the bank account at issue. *See id.* at 671-72.

14

*Procedure* § 1542 (3d ed. 2022). Although standing is a non-waivable jurisdictional issue, challenges to capacity are a waivable defense.[4] *Id.* Here, there is no question that Treshawn and Tyler have a case under Article III; rather the question is whether the Szabos may litigate that case on their behalf.

The Second Circuit has interpreted a Supreme Court decision to find that a power of attorney does not confer standing for an attorney-in-fact to bring suit in its own name because a power of attorney does not transfer an ownership interest in a claim. *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 108-09, 111 (2d Cir. 2008) (citing *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 288-90 (2008)). However, that court also held that a grantee's "power-of-attorney permits it to serve as an agent of its clients and to conduct litigation on behalf of its clients as their attorney-in-fact . . . ." *Id.* at 109 (footnote omitted).

Here, the Szabos have not attempted to bring suit in their own name, but rather have brought this action in their capacity as attorneys-in-fact on behalf of Treshawn and Tyler, the real parties in interest. *See Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 730 (6th Cir. 2016) (holding that "the real party in interest

---

[4] The Court need not decide whether Defendants have waived this defense by not specifically alleging capacity defects or by failing to move to dismiss Plaintiffs' Amended Complaint on those grounds in light of the analysis below.

is the person who is entitled to enforce the right asserted under the governing substantive law.") (internal citation and quotation marks omitted).

Thus, the Szabos need not have standing as individuals because they have not brought this suit on their own behalf, and the Court need only determine whether Treshawn and Tyler have standing to pursue this action. *See Loveland ex rel. Loveland v. State Farm Fire & Cas. Co.*, No. 13-20177-CIV, 2013 WL 1325365, at *2 (S.D. Fla. Apr. 1, 2013) (finding that where the holder of a power of attorney brought suit on behalf of his father the court need only determine whether the father had standing to pursue the action); *see also Kapp v. Booker*, No. 05-402-JMH, 2006 WL 385306, at *3 (E.D. Ky. Feb. 16, 2006) (finding that a power of attorney gave an agent legal "standing" to assert claims on behalf of her husband). As stated, it is undisputed that Treshawn and Tyler have satisfied the elements of Article III standing by asserting that they suffered redressable injuries caused by Defendants' alleged discrimination, bullying, and harassment.

Whether the Szabos can act in a representative capacity on behalf of Treshawn and Tyler is governed by Kentucky state law. *See* Fed. R. Civ. P. 17(b). Under K.R.S. § 457.350, "language in a power of attorney granting general authority with respect to claims and litigation authorizes the agent to," among other things, "[a]ssert and maintain before a court or administrative agency a

16

claim, claim for relief, [or] cause of action . . . ." Because there is no question that the powers of attorney executed by Treshawn and Tyler are valid and because each grants the Szabos the authority to "institute, supervise, [and] prosecute . . . any and all legal, equitable, judicial, or administrative hearings, actions, suits, or proceedings involving [them] in any way," (Doc. 56-8 at 10, 39), the Szabos have capacity to bring this suit on behalf of Treshawn and Tyler. Accordingly, the request in Plaintiffs' Supplemental Response, (Doc. 65 at 2; Doc. 65-1), will be construed as a Motion to Amend the Complaint and that Motion will be granted.[5]

Thus, there is no defect in standing and the Court has jurisdiction over this matter.

### B. § 1983

In Plaintiffs' first claim, pursuant to 42 U.S.C. § 1983, they allege that Defendants violated the Fourteenth Amendment by "depriv[ing] the Plaintiffs of their right to be educated,

---

[5] Although Plaintiffs' Motion is procedurally improper, as it was attached to their Supplemental Response, does not indicate the grounds upon which the amendment is sought, and Plaintiffs have failed to provide a proposed amended complaint, *see C & L Ward Bros., Co. v. Outsource Solutions., Inc.*, 547 F. App'x 741, 745 (6th Cir. 2013) (internal citations omitted), the Court will nonetheless grant it in order to proceed to the merits of the case, as the Supplemental Response provides clarity on the narrow and specific amendment Plaintiffs are seeking and that amendment will not prejudice Defendants, as it changes only the caption of the case without altering the causes of action or the alleged facts supporting them. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend pleadings] when justice so requires.").

including extracurricular participation, in an environment free of discrimination, retaliation, harassment and bullying" and their right to equal protection without due process. (Doc. 20 ¶¶ 62-63). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (internal citations omitted).

However, "[i]t is well-established that students do not have a general constitutional right to participate in extracurricular athletics." *Lowery v. Euverard*, 497 F.3d 584, 588 (6th Cir. 2007) (collecting cases); *see also Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 980 F.2d 382, 387 (6th Cir. 1992) ("The main purpose of high school is to learn science, the liberal arts and vocational studies, not to play football and basketball."); *S.B. ex rel. Brown v. Ballard Cnty. Bd. of Educ.*, 780 F. Supp. 2d 560, 567-68 (W.D. Ky. 2011) (finding that playing high school softball is "a privilege," not a right, and deprivation of the ability to play could not sustain a due process claim). Accordingly, Plaintiffs' § 1983 claim fails to the extent that it is based on any deprivation of Treshawn and Tyler's ability to play basketball.

Although Plaintiffs allege that they were also deprived of their right to be generally educated in an environment free from discrimination and harassment, there is no evidence to support

18

such a claim in the record. All of the alleged incidents of discrimination and harassment referenced by Plaintiffs occurred outside the school day at basketball practices, scrimmages, and games and there is no allegation, let alone evidence, that these after-school incidents detracted from Treshawn and Tyler's ability to learn during the school day. Further, when Sharon Szabo requested that Tyler be moved out of Coach Highbaugh's math class based solely on his alleged treatment at basketball practice, Tyler was placed in another class within five days. (Doc. 56-1, S. Szabo Aff. ¶ 12; Doc. 56-5 at 14–15).[6] Thus, no reasonable jury could find that Plaintiffs were deprived of their right to be educated in an environment free from discrimination.

Plaintiffs' claim that they were deprived of their right to equal protection similarly fails. To prevail on an equal protection claim, a plaintiff must show that "the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal citation and quotation marks omitted). "The threshold element of an equal protection claim is disparate

---

[6] Mrs. Szabo's email requesting the schedule change refers only to two alleged incidents at basketball practice and, in it, she does not claim that Tyler's ability to learn in Coach Highbaugh's math class was ever impacted or that Coach Highbaugh ever bullied or harassed Tyler during the school day. (*See* Doc. 56-5 at 14–15).

treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). "In opposition to a motion for summary judgment, it is plaintiff who possesses the burden of demonstrating that the defendants treated similarly situated individuals in a disparate manner." *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1360 (6th Cir. 1996) (citing *Gillard v. Norris*, 857 F.2d 1095, 1101 (6th Cir. 1988)).

Here, Plaintiffs have failed to present any evidence that other students were similarly situated, meaning that they had engaged in similar conduct, but were treated differently, or that any disparate treatment either burdened a fundamental right, targeted a suspect class, or had no rational basis. Sharon Szabo claims that Coaches Stainforth and Highbaugh "gave [Treshawn] consequences that other kids did not get." (Doc. 56-1, S. Szabo Aff. ¶ 18). However, the only "consequences" given to Treshawn were that he was barred from playing in a game after skipping a practice, he was suspended from the team for two weeks for "disrespectful" behavior including asking to play on the JV team in a way that was "so aggressive it scared" Coach Stainforth, and that he was dismissed from the basketball team for the remainder of the season after being suspended from school for telling a

cafeteria employee that she made him "horny."[7] (Doc. 20 ¶ 26, 49; Doc. 48 at 7-9; Doc. 50-3 at 1-3; Doc. 56-1, S. Szabo Aff. ¶ 6-7, 11, 22; Doc. 60, S. Szabo Dep. at 42:2-5).

Plaintiffs have only alleged two incidents of purported disparate treatment as to Treshawn, but neither are sufficient to support their claim. First, Tyler testified that another student, who is also Black, said "This play fucking sucks" during basketball practice and his only consequence was that he had to play a scrimmage on the JV team. (Doc. 58, T. Szabo Dep. at 63:15-25). Although it is dubious whether that student's conduct was similar enough to Treshawn's conduct to make them "similarly situated," even if it was, Plaintiffs must show that there was no rational basis for the different consequences in light of the fact that the student allegedly treated more favorably was also Black, so no suspect class could have been targeted,[8] and, as discussed above, Treshawn did not have a fundamental right to play basketball.

This is a substantial burden that Plaintiffs have not met, as they have failed to negate "any reasonably conceivable state of facts that could provide a rational basis for the disparate

---

[7] Plaintiffs do not allege that the suspension from school was an act of discrimination and the Szabos agree "that it was inappropriate for Treshawn to say 'horny' to the lunch lady." (*See* Doc. 56-1, S. Szabo Aff. ¶ 21).

[8] Plaintiffs have not alleged that Treshawn is a member of a suspect class that is not race-based, as "[d]isabled persons are not a suspect class for purposes of an equal protection challenge." *See S.S. v. E. Ky. Univ.*, 532 F.3d 445, 457 (6th Cir. 2008) (citing *Tennessee v. Lane*, 541 U.S. 509, 522 (2004)).

treatment." *See Clemons ex rel. T.W. v. Shelby Cnty. Bd. of Educ.*, 818 F. App'x 453, 467 (6th Cir. 2020) (internal citation and quotation marks omitted). Treshawn's disrespectful behavior and use of profane language was part of a series of events that took place during school hours, as opposed to the other student's one-time comment at an after-school practice. Maintaining order and student safety is a legitimate purpose and the facts here illustrate that the coaches' decisions to suspend and then remove Treshawn from the team were rationally related to that purpose, particularly in light of Coach Stainforth's perception of Treshawn's conduct as potentially dangerous. *See id.* (finding that removing a student from a high school tennis team due to concerns about disruptions and safety was rationally related to the legitimate purposes of maintaining student safety and order); *see also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999) (cautioning that "courts should refrain from second-guessing the disciplinary decisions made by school administrators.") (internal citation omitted).

The second purported incident of disparate treatment occurred in June 2018, after Treshawn and Tyler were no longer enrolled in the District, when a Dixie Heights student allegedly called another student a "fucking nigger" and pushed him during a basketball scrimmage but was not punished. (Doc. 60, S. Szabo Dep. at 102:4-17, 105:16-22; Doc. 61, R. Szabo Dep. at 85:6-23). However, all of

the evidence in the record regarding that alleged incident is hearsay, as none of the testifying witnesses in this case were present at the scrimmage and the Szabos were only informed about it by the other student's coach and other unnamed individuals who had attended the scrimmage. (Doc. 60, S. Szabo Dep. at 102:2-9, 102:18-23; Doc. 61, R. Szabo Dep. at 86:10-20). Because any statements other people made to the Szabos about the scrimmage are inadmissible hearsay, the Court may not consider that incident in the context of a motion for summary judgment. *See Flones v. Beaumont Health Sys.*, 567 F. App'x 399, 405 (6th Cir. 2014) ("[I]t is well established that a court may not consider inadmissible hearsay when deciding a summary-judgment motion.").

Similarly, Plaintiffs have failed to identify any students who were similarly situated to Tyler but suffered different consequences. Plaintiffs' only allegations regarding negative treatment of Tyler are that Coach Highbaugh sent Tyler back to the locker room during a game for not responding when he asked, "Who's ready to go back in?" and that he threw a basketball forcefully against a wall behind Tyler, nearly hitting him in the head. (Doc. 20 ¶¶ 42, 45; Doc. 48 at 17).

As to the first incident, Sharon Szabo testified that both Tyler and another player who did not raise his hand in response to Coach Highbaugh's question were sent to the locker room. (Doc. 56-1, S. Szabo Aff. ¶ 17). That is the exact *opposite* of disparate

23

treatment as both players who engaged in the same conduct were subjected to the same consequence. As to the second incident, Tyler testified that Coach Highbaugh was imitating the left one-handed pass he had just attempted and that the ball went between him and other players after bouncing off the wall. (Doc. 58, T. Szabo Dep. at 44:14–19, 45:5–19). Plaintiffs have not alleged that other players made similar passes at practice, but that Coach Highbaugh attempted to correct them in other, safer ways. While throwing the ball at the wall near the students may have been ill-advised, there is no evidence that it was thrown at Tyler specifically, but rather Tyler stated that Coach Highbaugh threw it among several players. Thus, that incident cannot support an equal protection claim.[9]

Because Plaintiffs have failed to show that they were deprived of any protected interests or rights, they cannot proceed to the second part of their Fourteenth Amendment claim: that such deprivation occurred without due process. Regardless, Plaintiffs'

---

[9] Although Plaintiffs also allege that Tyler was subjected to "yelling" and "physical aggression" from the coaches, (Doc. 56 at 2), the cited portions of Tyler's deposition do not reflect that he testified to experiencing such treatment or that it was different from that experienced by other players. (*See* Doc. 58, T. Szabo Dep. at 36–49). Further, any evidence that the coaches told other students not to "hang out with" or to distance themselves from Treshawn and Tyler is inadmissible hearsay that cannot be considered at the summary judgment stage, *see Flones*, 567 F. App'x at 405, because Treshawn and Tyler testified that their knowledge of those conversations is based on what they were told by other students. (*See* Doc. 58, T. Szabo Dep. at 48:6–49:11; Doc. 59, Cody Dep. at 67:14–68:8).

due process claim fails as a matter of law against all Defendants for several independent reasons.

Although Plaintiffs do not clarify whether they are pursuing a procedural or substantive due process claim, they have not provided sufficient evidence for either to proceed. There is no evidence or even an allegation that Defendants failed to provide Treshawn and Tyler with "adequate procedural rights prior to depriving them of [a] protected interest" and, accordingly, any procedural due process claim they have attempted to make must fail. *See Med Corp. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002) (internal citation and quotation marks omitted).

Further, allegations, like the ones here, that school employees harassed or psychologically bullied students are insufficient to satisfy the "shock the conscience" standard required for a substantive due process claim. *See N.P. v. Kenton Cnty. Pub. Schs.*, No. 20-142-DLB-EBA, 2021 WL 4432511, at *3-4 (E.D. Ky. Sept. 27, 2021) (citing *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 678 (6th Cir. 2016) (dismissing an identically pled claim against the same school district).

Although Plaintiffs argue that Defendants failed to provide them with due process by acting with deliberate indifference, (Doc. 56 at 7), they have failed to demonstrate that Defendants acted with "racially discriminatory intent with respect to their response to [allegations of] harassment," which is required in

25

order to state a claim for violation of the Fourteenth Amendment's Equal Protection Clause. *See Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612, 618 (6th Cir. 2012) (internal citation omitted).

Neither have Plaintiffs demonstrated deliberate indifference by showing that Defendants' response was "clearly unreasonable in light of the known circumstances." *See Davis*, 526 U.S. at 648. On the contrary, Plaintiffs acknowledge that they met with multiple District officials and received a letter stating that their claims had been "thoroughly investigated," including by questioning at least one student about Coach Highbaugh's conduct, and that no allegations of bullying had been substantiated. (Doc. 20 ¶ 55; Doc. 56-1, S. Szabo Aff. ¶¶ 13-14, 20). Although the Szabos may disagree with the outcome of the investigation, they have failed to demonstrate that Defendants' actions were "clearly unreasonable," particularly given that Sharon Szabo did not respond to Superintendent Webb's request for her to send him additional documentation and specific concerns in writing until after Treshawn and Tyler had been withdrawn from the District. (*See* Doc. 20 ¶¶ 56-57).[10]

---

[10] Although not specifically alleged by Plaintiffs, none of the administrator Defendants may be held liable in their supervisory capacity either. *See Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) (citing *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)) (holding that "'[s]upervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act,'" but "[r]ather, the supervisors must have actively engaged in unconstitutional behavior.").

Additionally, the District and the Kenton County Board of Education, as local governing bodies, are "liable under § 1983 only if the action that is alleged to be unconstitutional implements or executes a policy or custom of that body." *See Meredith v. Jefferson Cnty. Bd. of Educ.*, No. 3:02-CV-620-H, 2007 WL 3342258, at *5 (W.D. Ky. Nov. 9, 2007) (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)).[11]

Here, Plaintiffs do not assert that there was an officially enacted policy in the District to discriminate, harass, or retaliate against students, or that the District or Board of Education had a custom of affirmatively condoning discrimination and harassment. *See Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 508 (6th Cir. 1996) (opining that no municipality could have a policy or custom of affirmatively condoning abuse). Rather, Plaintiffs base their claim against the District and Board of Education on deliberate indifference and an alleged custom to fail to act to prevent or remedy discrimination and harassment, contending that because each Defendant is a "link[] on the school

_____

[11] Because "[s]uing a government employee in his official capacity 'generally represent[s] only another way of pleading an action against an entity of which the officer is an agent,'" the Court will dismiss the official capacity claims against all named Defendants, as those claims are duplicative of the claims against the District and the Board of Education. *See Barr v. Jefferson Cnty. Bd. of Educ.*, 686 F. Supp. 2d 699, 704 (W.D. Ky. 2010) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)) (finding that in the Eastern and Western Districts of Kentucky courts have "adopted the practical approach" of dismissing official capacity claims where the local government entity is also a named defendant).

district chain . . . there is a policy or custom affecting the entire school district that is unconstitutional." (Doc. 56 at 6).

This bare-bones allegation is not sufficient to illustrate a custom that would support *Monell* liability, which "must 'be so permanent and well settled as to constitute a custom or usage with the force of law.'" *Claiborne Cnty.*, 103 F.3d at 507 (quoting *Monell*, 436 U.S. at 691). First, the inaction of the District and Board of Education could not be the "moving force" behind any constitutional deprivation because all of the alleged disparate treatment, harassment, and discrimination occurred before April 2018, when the Szabos first met with District administrators to discuss their concerns with Treshawn and Tyler's treatment on the basketball team, and Sharon Szabo did not provide the supplemental information as requested by Superintendent Webb to continue the investigation until after Treshawn and Tyler had ceased attending school at Dixie Heights. *See id.* at 508 (citing *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989)). Thus, Plaintiffs necessarily could not have suffered further harm after the District became aware of the alleged harassment and subsequently failed to act.

Further, "[t]here is an analytical distinction between being deliberately indifferent as to one particular incident, and having a 'policy' of always being deliberately indifferent to unconstitutional actions." *Id.* Plaintiffs have only presented evidence regarding the District's response to the Szabos'

28

complaints about Treshawn and Tyler's treatment on the basketball team and have not provided any evidence of inaction in response to other incidents of allegedly unconstitutional conduct.[12] Thus, Plaintiffs have failed to illustrate an unconstitutional policy or custom sufficient to hold the District or the Board of Education liable under *Monell*.

Because Plaintiffs have not shown that Defendants caused them to be deprived of any protected interests or rights without due process, the Court finds that their § 1983 claim fails as a matter of law.

## C. Disability Discrimination

Second, Plaintiffs claim that Treshawn suffered discrimination because of his disability in violation of 29 U.S.C. § 794 (Section 504 of the Rehabilitation Act of 1973), 42 U.S.C. § 12132 *et seq.* (Title II of the Americans with Disabilities Act of 1990), and K.R.S. Chapter 344 *et seq.* (Doc. 20 ¶¶ 65–71).[13] "[A]

---

[12] Although Sharon Szabo testified that another student, who was also African American and had an IEP, was the only other student removed from the basketball team that year, she did not testify to the circumstances surrounding that student's removal or provide any evidence that the removal was unconstitutional, that the District was aware of the removal, or that the District failed to act with respect to that student. (*See* Doc. 60, S. Szabo Dep. at 113:8-20).

[13] These claims may be analyzed under the same standard "because 'Title II adopts the substantive standards of § 504.'" *N.P.*, 2021 WL 4432511, at *4 (quoting *Doe v. Ohio*, No. 2:91-cv-464, 2004 WL 7347115, at *10 (S.D. Ohio July 9, 2004)). Further, "KRS § 344.010 *et seq.*, the Kentucky Civil Rights Act ("KCRA"), mirrors the ADA and 'consequently, claims brought under the KCRA are interpreted consistently with the

plaintiff seeking to state a claim under either the ADA or § 504 against a school receiving federal financial assistance must show that he or she is (1) disabled under the statute, (2) 'otherwise qualified' for participation in the program, and (3) being excluded from participation in, denied the benefits of, or subjected to discrimination under the program by reason of his or her disability." *S.S.*, 532 F.3d at 453 (internal citation omitted).

Defendants do not dispute that the District received federal financial assistance, that Treshawn is disabled for the purposes of the relevant statutes, or that he was otherwise qualified to participate in the District's basketball program based on his physical characteristics and skill level. (Doc. 48 at 25). Thus, the only dispute is whether Plaintiffs have satisfied the third prong: that Treshawn was excluded from, denied the benefits of, or subjected to discrimination under the basketball program because of his disability.

In the absence of direct evidence of discrimination,[14] courts apply the *McDonnell Douglas* burden-shifting framework to determine whether a plaintiff has made out a sufficient case based on

---

standards developed under the ADA.'" *Id.* (quoting *Bryson v. Regis Corp.*, 498 F.3d 561, 574 (6th Cir. 2007)).

[14] Plaintiffs do not argue that they have established any direct evidence of discrimination and neither can the Court conclude that the record contains such a "smoking gun." *See Gohl*, 836 F.3d at 683 (citing *Amadeo v. Zant*, 486 U.S. 214, 226 (1988)) (finding no direct evidence where there was no indication that school officials intentionally mistreated disabled students because they were disabled).

indirect evidence. *See Gohl*, 836 F.3d at 682. "In an indirect case, the third factor's causality requirement demands a showing that similarly situated non-protected students were treated more favorably." *Id.* at 683 (citing *Shah v. Gen. Elec. Co.*, 816 F.2d 264, 268 (6th Cir. 1987)). If a plaintiff makes such a showing, the burden shifts to the school to offer a legitimate nondiscriminatory reason for its actions and, if the school offers such a reason, the burden shifts back to the plaintiff to establish that the school's proffered reason is merely a pretext for unlawful discrimination. *Id.* (internal citations omitted).

Plaintiffs have failed to establish a prima facie case of disability discrimination because they have failed to show that any students who were not disabled were similarly situated to Treshawn but were treated more favorably. As discussed above, the Court may not consider the purported incident in which a Dixie Heights student used a racial slur and pushed another student at a basketball scrimmage because all of the evidence in the record regarding it is based on inadmissible hearsay. As to the only other incident Plaintiffs have pointed to, the Court cannot conclude that a student's one-time use of profane language at an after-school practice is comparable to Treshawn's behavior toward Coach Stainforth during the school day such that the two students were "similarly situated."

Nonetheless, even if the Court could find that the conduct was similar to Treshawn's and could conclude that the other student was not disabled, despite the lack of any evidence in the record as to his disability status, Defendants have offered a nondiscriminatory reason for their actions: namely, that Treshawn's behavior and attitude over time warranted the consequences imposed on him. (*See* Doc. 48 at 25-26).

Plaintiffs have not argued that this proffered reason is merely a pretext for discrimination based on disability and that alone is fatal to their claim. *See Gohl*, 836 F.3d at 683-84 (finding that a disability discrimination claim against a school failed as a matter of law where a plaintiff had not argued that the school's defenses were pretextual or provided direct evidence of discrimination); *see also Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) ("[A] plaintiff must articulate some cognizable explanation of how the evidence [he] has put forth establishes pretext.").

Nonetheless, the evidence Plaintiffs have put forth is insufficient to establish pretext. Sharon Szabo testified that she thought Coach Stainforth and Athletic Director Wilhoite were not even aware that Treshawn had a disability until December 18, 2017, the day they agreed to reduce Treshawn's consequence for being "disrespectful" and missing a practice from complete dismissal to a two-week suspension. (Doc. 56-1, S. Szabo Aff. ¶ 10-11). The

Szabos agreed to that suspension at the time, particularly in light of the fact that the Christmas break began the next day, and never disputed that Treshawn skipped at least one practice. (*Id.* ¶¶ 8, 19).[15]

There is no allegation or evidence that Defendants engaged in any conduct that indicates even a possibility that they were motivated by animus toward students with disabilities, much less the "significant" animus required to succeed on a claim under the Americans with Disabilities Act or the even higher bar under the Rehabilitation Act that Defendants' actions were "*solely* by reason of" Treshawn's disability. *See Gohl*, 836 F.3d at 682 (internal citations omitted). Treshawn himself testified that he did not believe any person at Dixie Heights intentionally discriminated against him because of his disability. (Doc. 59, Cody Dep. at 46:14–17).

That another student with an IEP was also allegedly dismissed from the basketball team does not establish that the school's actions were pretextual with respect to Treshawn, particularly given that the record is devoid of information regarding whether the other student is disabled for the purposes of the statutes and

---

[15] Although Treshawn was later dismissed from the basketball team entirely, that was only after he had been suspended from school for a separate incident of inappropriate conduct and there is no indication in the record that any other students, regardless of disability status, had been suspended from school but remained on the team.

no witness with personal knowledge of the circumstances of that student's dismissal has testified. Further, Plaintiffs do not attempt to argue that Treshawn's suspension for using the word "horny" at school was improper or that it was not the District's policy to remove students from sports teams after such a suspension.

The Szabos' subjective belief that Treshawn did not act aggressively, despite the fact that they were not present for the alleged incident, cannot support his claim either. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992) (collecting cases) (holding that "rumors, conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law."); *see also Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 470 (6th Cir. 2002) ("[M]ere conjecture that the [defendant's] explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.") (internal citation and quotation marks omitted).

Therefore, Treshawn's disability discrimination claim fails as a matter of law because he can establish neither a prima facie case nor that Defendants' proffered reasons for their actions were a pretext for unlawful discrimination. Accordingly, the Court need not address the parties' alternative arguments regarding whether Treshawn's disability discrimination claims are barred by his previous Settlement Agreement.

34

## D. Race Discrimination

Plaintiffs also claim that Defendants discriminated against Treshawn based on his race, in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. "Title VI prohibits any 'program or activity receiving Federal financial assistance' from discriminating against any person 'on the ground of race, color, or national origin.'" *M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 453 (6th Cir. 2021) (quoting 42 U.S.C. §2000d). However, "it proscribes only *intentional* discrimination." *Id.* (citing *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)). "[W]here the decisionmaker is motivated by a factor other than the excluded party's race, there can be no intentional discrimination." *Buchanan*, 99 F.3d at 1356 (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993)).

The Sixth Circuit has "assume[d] without deciding" that the *McDonnell Douglas* burden-shifting framework governs Title VI claims. *Johnson v. City of Clarksville*, 186 F. App'x 592, 594-95 (6th Cir. 2006) (citing *Paasewe v. Ohio Arts Council*, 74 F. App'x 505, 508 (6th Cir. 2003)). To establish a prima facie case in the absence of direct evidence of discrimination,[16] Plaintiffs must show that similarly situated non-protected students received more

---

[16] Plaintiffs have not argued that they have established direct evidence of discrimination based on race.

35

favorable treatment than Treshawn. *See id.* (internal citations omitted).

Plaintiffs have not introduced any evidence of disparate treatment based on race. Indeed, during the only incident that Plaintiffs have introduced and that the Court may consider, another Black student was allegedly treated more favorably than Treshawn. (*See* Doc. 58, T. Szabo Dep. at 63:15-25). Plaintiffs have failed to point to a single piece of admissible evidence illustrating an occasion on which a similarly situated non-Black student was treated more favorably than Treshawn.

Further, as discussed above, even if Plaintiffs could establish a prima facie case of racial discrimination, they have not established or even argued that Defendants' proffered reason for their actions was pretextual. Treshawn testified that he believed that no one at Dixie Heights had intentionally discriminated against him because of his race. (Doc. 59, Cody Dep. at 46:10-13). That another African American student was also removed from the basketball team during the same week as Treshawn does not create a genuine issue of material fact as to whether Defendants' proffered reason for Treshawn's removal was pretextual, particularly because the record does not reflect the circumstances of the other student's dismissal and because there was at least one other African American player who remained on the team at that time. (Doc. 60, S. Szabo Dep. at 38:8-19). As

36

discussed above, Plaintiffs have not argued that removal from the basketball team was an improper consequence of Treshawn's suspension from school and there is no evidence to indicate that Defendants were motivated by anything other than that suspension when they dismissed Treshawn from the team.

Although Plaintiffs point to alleged statements by Coach Stainforth, including that "Treshawn will end up on the streets of Covington with the rest of them," that "he didn't want to be another white man to let someone down, to let [Treshawn] down," that "we don't feel we can help him," and that Treshawn was "aggressive" and "disrespectful to the coaches," (*Id.* at 38:21–24, 39:3–7, 41:6–11, 57:8–14), in support of their claim, these statements are insufficient to illustrate that Defendants' nondiscriminatory reason for suspending and removing Treshawn from the basketball team, his attitude and behavior, was a pretext for unlawful race discrimination. *See Worthy v. Mich. Bell. Tel. Co.*, 472 F. App'x 342, 347 (6th Cir. 2012) (finding that an employer's use of the word "boy" was not evidence of pretext because there was no evidence to suggest that use of the term reflected racial animus).

Even if the Court could find that the first two statements were related to Treshawn's race, those statements do not reflect racial animus. Both were made on December 18, 2017, the day Treshawn's original dismissal was reduced to a two-week

suspension, and the context of those statements indicates that, to the extent Coach Stainforth considered race at all, he weighed it in favor of reducing Treshawn's original punishment. (Doc. 60, S. Szabo Dep. at 38:21–39:7, 39:18–24).[17] Thus, they were not made in the context of taking an action with adverse impact on Treshawn, but rather with showing him some leniency. Further, the latter three statements, in both content and context have nothing to do with race.[18]

Accordingly, Treshawn's racial discrimination claim fails as a matter of law because he can establish neither a prima facie case nor that Defendants' proffered reasons for their actions were a pretext for unlawful discrimination.

## E. Retaliation

Plaintiffs' next claim is that Tyler was subjected to retaliation by Coaches Stainforth and Highbaugh "solely because of his familial relationship with [Treshawn], an African American and disabled person" in violation of 34 C.F.R. § 100.7. (Doc. 20 ¶ 77–79; Doc. 56 at 8). Under 34 C.F.R. § 100.7(e),

---

[17] Although Sharon Szabo testified that Coach Stainforth made those statements during a meeting on December 18, 2018, instead of December 18, 2017, (Doc. 60, S. Szabo Dep. at 39:1–2), that necessarily must be an error as Treshawn and Tyler were withdrawn from Dixie Heights in May 2018.

[18] None of the alleged statements can serve as direct evidence of discrimination either. *See Worthy*, 472 F. App'x at 348 (finding that isolated derogatory statements that were not part of a pattern of biased comments and were not clearly reflective of discriminatory bias were not direct evidence of discrimination).

[n]o recipient [of federal funds] or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the [Civil Rights] Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in any investigation, proceeding or hearing under this part.

Just as with the above claims where, as here, the plaintiff relies on indirect evidence, the *McDonnell Douglas* burden-shifting framework applies to claims under 34 C.F.R. § 100.7. *See Wilbanks v. Ypsilanti Cmty. Sch.*, 742 F. App'x 84, 87 (6th Cir. 2018) (citing *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010)). To establish a prima facie case of retaliation, the plaintiff must show that (1) he engaged in protected activity; (2) the defendants knew of the protected activity; (3) the defendants then took a materially adverse action against him; and (4) there was a causal connection between his protected activity and the adverse action. *Id.* (citing *A.C. ex re. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013)).

Here, Plaintiffs have failed to establish at least the first and fourth elements of their claim. As to the first prong, Plaintiffs do not contend that Tyler ever engaged in protected activity. Rather they argue that it is sufficient that his parents complained to school staff regarding the issues that both he and Treshawn experienced. (Doc. 56-1, S. Szabo Aff. ¶¶ 23-24). However, Plaintiffs have failed to cite case law for the proposition that

a retaliation claim may lie where a parent engages in protected activity, but it is their child, a separate person, who suffers an alleged adverse consequence.

Even if this were sufficient, Plaintiffs have not established that the complaints the Szabos made were protected activity. While Sharon Szabo testified that she complained about general "bullying and harassment," (*Id.*), the record does not reflect that the Szabos raised the issue of discrimination, based on either Treshawn's race or his disability, until after the alleged retaliation against Tyler had already taken place. *See Saqr v. Univ. of Cincinnati*, No. 1:18-CV-542, 2019 WL 699347, at *14 (S.D. Ohio Feb. 20, 2019), *report and recommendation adopted*, 2019 WL 1200802 (S.D. Ohio Mar. 14, 2019) (finding that "a plaintiff is required to provide *some* factual detail concerning when and/or how he complained of discrimination" in order to state a claim for retaliation); *see also* 34 C.F.R. § 100.7(b) (providing that "[a]ny person who believes himself or any specific class of individuals to be subjected to *discrimination* prohibited by this part may . . . file . . . a written complaint.") (emphasis added).

Plaintiffs have also failed to demonstrate a causal connection between the Szabos' complaints and any adverse action suffered by Tyler. While Plaintiffs argue that Coaches Stainforth and Highbaugh treated Tyler disparagingly, as discussed above, the cited portions of his deposition do not reflect that he experienced

any such treatment. (*See* Doc. 58, T. Szabo Dep. at 36–49). Further, the Court may not consider the Coaches' purported statements to other students encouraging them to isolate Tyler, as the only evidence of those statements is inadmissible hearsay.

None of the other incidents Plaintiffs point to are causally connected to the Szabos' complaints. There is no evidence that Tyler and the other player who failed to raise his hand during the game were sent back to the locker room for any reason other than their particular conduct in that moment. Similarly, Tyler testified that when Coach Highbaugh threw the ball at the wall near him, it was not intentionally thrown toward Tyler's head, but was rather because Coach Highbaugh "didn't think [a one-handed pass] would be accurate" and he was imitating the pass Tyler had just made. (*Id.* at 44:11–45:2). There is no evidence, other than conjectures made by Plaintiffs, that Coach Highbaugh's conduct was motivated by anything other than demonstrating improper passing technique.

Tyler also testified that he "started getting in trouble a little more" at "around the same time" as Treshawn because he was told that he wasn't "playing hard enough or playing good enough" and that "[i]t seemed like [he] wasn't really allowed to talk," "help out," or make constructive statements. (*Id.* at 36:22–37:15). However, even if these vague perceptions were sufficient to constitute evidence of adverse actions, temporal proximity alone

is insufficient to establish a causal connection where, as here, the chronology is unclear and the only testimony regarding the timeline is that the actions occurred "around the same time." *See L.G. ex rel. G.G. v. Bd. of Educ. of Fayette Cnty., Ky.*, 775 F. App'x 227, 233 (6th Cir. 2019) (finding that a "vague, confused chronology does not provide sufficient details to suggest a clear nexus based on temporality alone" particularly where there is no additional evidence to corroborate a theory of retaliation).

Accordingly, Plaintiffs have failed to establish a prima facie case of retaliation.

### F. Bullying and Harassment

Finally, Plaintiffs claim that Defendants bullied and harassed Treshawn and Tyler in violation of K.R.S. §§ 158.148 and 158.156. (Doc. 20 ¶¶ 80-84).

K.R.S. § 158.148 requires local boards of education to formulate "a code of acceptable behavior and discipline to apply to the students in each school operated by the board." "Procedures for investigating and responding to a complaint or a report of bullying or a violation of the code" must be stated in the code. K.R.S. § 158.148(5)(e)(2). Further, "[t]he principal of each school shall apply the code of behavior and discipline uniformly and fairly to each student at the school without partiality or discrimination." *Id.* § 158.148(5)(f).

Plaintiffs' claim under this section fails because they have not alleged or introduced evidence indicating that the District or Board of Education failed to establish such a code. Neither have Plaintiffs alleged or introduced evidence from which the Court could find that Principal Hendrix applied the code to students in a discriminatory or unfair manner or failed to investigate and respond to complaints in the manner specified in the code. *See N.P.*, 2021 WL 4432511, at *7 (dismissing a claim under K.R.S. § 158.148 where the plaintiffs failed to allege that the same school district failed to establish a behavior code or that the principal failed to apply the code fairly).

K.R.S. § 158.156 requires school employees "who know[] or ha[ve] reasonable cause to believe that a school student has been the victim of a violation of any felony offense specified in KRS Chapter 508 committed by another student . . . [to] immediately cause an oral or written report to be made . . . ." Plaintiffs have failed to allege or introduce evidence that Treshawn and/or Tyler were victims of any felony offense committed by any other student. Thus, they have not established that any Defendant had an obligation to create a report under K.R.S. § 158.156 and their claims that Defendants acted with deliberate indifference to the Szabos' reports of bullying and harassment, (*see* Doc. 56 at 9), are misplaced. *See N.P.*, 2021 WL 4432511, at *7 (dismissing a claim under K.R.S. § 158.156 where the plaintiffs had not alleged that

43

another student committed a felony offense but merely argued that the defendants had failed to report bullying and harassment).

While Plaintiffs argue that the District's investigation was deficient because it failed to consider documentary evidence, conduct interviews, or consider violations of the Professional Code of Ethics for Kentucky Certified Personnel or Kenton County Board of Education Policy, (Doc. 56 at 9), none of these purported deficiencies are relevant to a claim under K.R.S. § 158.156. Accordingly, Plaintiffs' claim under that statute also fails.[19]

### Conclusion

Therefore, for the reasons stated above, **IT IS ORDERED** that:

(1) The request attached to Plaintiffs' Supplemental Response (Doc. 65-1) be, and is hereby construed as a Motion to Amend the Complaint and that Motion be, and is hereby, **GRANTED**;

(2) Defendants' Motion for Summary Judgment on all Plaintiffs' claims (Doc. 48) be, and is hereby, **GRANTED**;

(3) A separate judgment shall enter concurrently herewith.

This 10th day of February 2023.



Signed By:

_**William O. Bertelsman**_  _WOB_

**United States District Judge**

---

[19] Because each of Plaintiffs' claims fails as a matter of law for independent reasons, the Court need not address Defendants' argument that they are entitled to qualified immunity, which was raised only in their Reply brief. (*See* Doc. 62 at 13–14).